UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

═══════════════════════════════════════════════════════

CHERYL J. JONES,

                Plaintiff,

-v.-                                  5:11-cv-01249  NPM

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.

-------------------------------------------------------------------------------------------------

| APPEARANCES: | OF COUNSEL: |
|---|---|
| Olinsky Law Group<br>Attorney for Plaintiff<br>300 S. State Street<br>5th Floor, Suite 520<br>Syracuse, NY 13202 | Howard D. Olinsky, Esq. |
| Social Security Administration<br>Attorneys for Defendant<br>Office of Regional General Counsel<br>Region II<br>26 Federal Plaza - Room 3904<br>New York, NY 10278 | Vernon Norwood, Esq. |

NEAL P. McCURN, Senior District Court Judge

## **MEMORANDUM - DECISION AND ORDER**

This action was filed by plaintiff Cheryl J. Jones ("plaintiff") pursuant to 42

U.S.C. § 405(g) to review the final determination of the Commissioner ("the Commissioner") of the Social Security Administration ("SSA"), who denied her application for disability insurance benefits ("DIB"). Currently before the court is plaintiff's motion for judgment on the pleadings (Doc. No. 12 ), seeking an order from the court finding that plaintiff is entitled to disability benefits under the provisions of the Social Security Act ("SSA"), or in the alternative, remanding the case for further proceedings. Also before the court is the Commissioner's motion for judgment on the pleadings (Doc. No. 13) seeking affirmation of the Commissioner's findings. For the reasons set forth below, the Commissioner's motion is granted, and plaintiff's motion is denied.

## I.      Procedural History and Facts

### A.      Procedural History

On June 23, 2009, plaintiff protectively filed an application for DIB, alleging disability beginning March 28, 2008, due to myopathy and asthma. T.[1] 137, 153.[2] The Commissioner originally denied the claim, and plaintiff requested a hearing. On January 13, 2011, after a hearing before Administrative Law Judge Jeffrey M. Jordan ("the ALJ"), the ALJ denied plaintiff's application. T. 8-21.

---

[1]      The administrative transcript will be cited as "T.__."

[2]      The court notes that this is the date plaintiff reports that she took a buyout from her former employer, New Process Gear, Inc., East Syracuse, NY. T. 48.

The ALJ found that plaintiff met the insured status requirements of the Social Security act through December 31, 2013, had not engaged in substantial gainful activity since the alleged onset date of March 28, 2008, and had the severe impairments of myopathy, hypertension, and sleep apnea. T. 13. The ALJ then determined that plaintiff did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR part 404, subpart P, appendix 1, and that plaintiff had the residual functional capacity to perform less than the full range of sedentary work. T. 13-14. The ALJ determined that plaintiff was unable to perform any past relevant work, but that there are jobs that exist in significant numbers in the national economy that plaintiff could perform. T. 19. On September 14, 2011 the Appeals Council denied a request for review. T. 1-3. This action followed, appealing the final decision of the Commissioner. The relevant time period for this appeal is between the alleged onset date of March 28, 2008, and the date of the ALJ's decision on January 13, 2011.

**B.    Statement of Facts**

Plaintiff was 44 years old on the alleged onset date. T. 137. Plaintiff reported completing the twelfth grade in 1984. T. 40, 158. Plaintiff previously worked as a machine operator in a car [transmission/transfer case] factory for 14 years. T. 41. On October 18, 2006, plaintiff treated with Paul Twydell, D.O. ("Dr.

Twydell") for complaints of muscle pain and muscle weakness. T. 236. Plaintiff reported "progressively worse" pain from February 2006 to May 2006. T. 236. Thereafter, plaintiff "was on medical leave from work from May 2006 to September 2006." T. 236. An EMG had revealed neuropathic and myopathic changes in multiple lower extremity muscles, and a muscle biopsy revealed atrophic fibers type 1 and type 2. T. 236. Physical examination revealed that plaintiff was obese, and had "moderate tenderness to moderate touch on both thighs anterior and posterior aspects." T. 236. Dr. Twydell noted that an EMG would be performed, and if suggestive of myopathy a muscle biopsy would be considered. T. 237. A muscle biopsy was subsequently performed.

On November 7, 2006, plaintiff presented to the emergency room after tripping on an escalator. T. 258. Anne M. Calkins, M.D.(Dr. Calkins") conducted a physical examination, which revealed a superficial clean abrasion on the distal anterior tibia. T. 258. Plaintiff reported stiffness with range of motion. T. 258. Dr. Calkins diagnosed plaintiff as suffering from muscle strain, contusions, and abrasions. T. 259. Plaintiff was given a tetanus shot and was instructed to followup with David T. Page, M.D. ("Dr. Page"). T. 259.

On January 3, 2007, Rabi Tawil, M.D. ("Dr. Tawil"), opined that results of the biopsy of plaintiff's left quadriceps muscle were consistent with slight

myopathy with central cores.  T. 238.  On July 17, 2008, a CT scan of plaintiff's neck revealed a "prominent thyroid gland bilaterally."  T. 262.  On November 5, 2008, plaintiff began treatment with Michael J. Parker, M.D. ("Dr. Parker").  T. 244.  Plaintiff was referred to Dr. Parker due to large bulges on the sides of her neck, and a feeling as if she were choking when lying down, and pain when raising arms above her head.  T. 244.  Physical examination revealed asymmetry of the neck, and palpation revealed swelling.  T. 244.  Dr. Parker diagnosed plaintiff as suffering from swelling in head and neck, and sleep disturbance unspecified. T. 245.  On November 24, 2008, plaintiff followed up with Dr. Parker for her neck mass.  T. 247.  Physical examination revealed asymmetry of the neck and palpation revealed swelling.  T. 247.  Dr. Parker diagnosed plaintiff as suffering from swelling in head and neck, and sleep disturbance unspecified.  T. 247-48. On December 12, 2008, a sleep study "confirmed the clinical diagnosis of [obstructive sleep apnea/H] syndrome, mild to moderate in nature with impact on oxygenation."  T. 249.  On April 21, 2009, Dr. Page treated plaintiff.  T. 293. Physical examination revealed that plaintiff's thyroid was minimally enlarged.  T. 294.  Dr. Page diagnosed plaintiff as suffering from diabetes mellitus, hypertension, and cough. T. 294.  On May 29, 2009, plaintiff treated with Dr. Page. T. 291.  After examination, Dr. Page diagnosed plaintiff as suffering from

asthma extrinsic unspecified, cough, and myopathy unspecified.  T. 292.

On October 3, 2009, George Alexis Sirotenko, D.O. ("Dr. Sirotenko"), conducted a consultative internal medicine examination.  Dr. Sirotenko noted that "[d]ue to difficulty with insurance, she has been somewhat sporadic with medication use," and plaintiff was unable to "obtain a CPAP machine[] due to insurance difficulties."  Medications were suggested to help treat plaintiff's myopathy, but the financial costs were too high.  Plaintiff reported "intermittent daytime fatigue, generalized muscle pain with activities of greater than a moderate degree of physical exertion." T. 279.  Physical examination revealed that plaintiff had limited hip flexion to 80 degrees bilaterally, and external rotation to 30 degrees bilaterally. T. 281.  Plaintiff's had a knee extension limited to zero degrees, and flexion to 110 degrees bilaterally.  Plaintiff had reduced strength of 4/5 in both her upper and lower extremities.  Moreover, Dr. Sirotenko noted that plaintiff had "[d]iffuse myofascial pain shoulder girdles, arms, upper and lower hip girdles, lower extremities." Id.  Plaintiff had decreased grip strength at 4/5.  T. 282.  Dr. Sirotenko diagnosed plaintiff as suffering from hypertension, myopathy, and a history of diabetes, sleep apnea, and asthma.  Dr. Sirotenko opined that plaintiff would have "[s]ignificant limitations regarding situations in which sleeping may place her or others in danger."  Plaintiff needs to avoid

operation of heavy equipment machinery "or driving an automobile." Plaintiff "would benefit from activities of a sedentary nature only. Plaintiff needs to avoid respiratory triggers which may exacerbate her asthma. Id.

On December 4, 2009, plaintiff treated with Dr. Page. Plaintiff reported weakness in her hands. T. 297. After examination, Dr. Page diagnosed plaintiff as suffering from myopathy unspecified, diabetes mellitus, hypertension, and esophageal reflux. T. 298. On May 5, 2010, plaintiff again treated with Dr. Page, reporting stiff neck. Plaintiff reported that she did not have insurance. Plaintiff was unable to lie down "because of adiposity in the neck, she gets [shortness of breath] with [laying down] [sic]." T. 303. After examination, plaintiff was diagnosed as suffering from diabetes mellitus, hypertension, myopathy, esophageal reflux, and "intervertebral disc cervical [with] myelopathy." T. 305.

On May 12, 2010, Dr. Twydell noted that he treated Plaintiff for congenital myopathy with central cores. Neuromuscular examination revealed that plaintiff was morbidly obese, and had tenderness to palpation over the right greater occipital nerve. Dr. Twydell diagnosed plaintiff as suffering from congenital myopathy with central cores, neck pain, low back pain, previous hypovitaminosis D, and "she may have right occipital neuralgia as well." T. 320.

On May 19, 2010, Dr. Twydell opined that plaintiff "should only

occasionally use her hands for handling and fingering." T. 326. Moreover, Dr. Twydell opined, "[t]he amount of pain [plaintiff] is in would eliminate the possibility of full-time employment for her at this point in time." T. 326. Financial difficulties affording treatment were noted. T. 326. On September 9, 2010, plaintiff again treated with Dr. Page. Plaintiff reported worsening symptoms, and that "she cannot lay [sic] down and sleep and has to sit up in a chair to sleep." Plaintiff reported fatigue. T. 309. Dr. Page diagnosed plaintiff as suffering from esophageal reflux and obstructive sleep apnea. T. 310. On September 15, 2010, plaintiff again treated with Dr. Page. T. 312. After examination, Dr. Page diagnosed plaintiff as suffering from esophageal reflux, hypertension, diabetes, myopathy, asthma, and chest pain. T. 313-14.

At her hearing, plaintiff testified that the reason she is no longer able to work are due to the pain she has throughout her body a "majority of the time." Plaintiff reported that her "hands are bad. And I cannot stand for a long period of time anymore." Plaintiff testified that central core myopathy was the cause of the pain and problem in her hands and legs. T. 42. Plaintiff reported pain of 6 to 7 on an average day, and she has to lie down a lot on bad days, which occur two to three times per week. Plaintiff testified that she has to lie down for 30 to 45 minutes until the pain subsides. T. 46.

The Commissioner incorporates plaintiff's statement of facts with the exception of any inferences, suggestions, or arguments contained therein, and supplements the statement of facts as follows: plaintiff was 46 years old on the date of the ALJ's decision. T. 21, 39-40, 137, 158. As part of her disability application, plaintiff completed an activities of daily living questionnaire. T. 172-82. Plaintiff stated that she took care of her own personal hygiene and grooming needs; took care of her ten-year-old daughter; cooked; washed dishes; swept floors; cleaned the bathroom; house cleaned and did laundry, albeit with help from her husband and daughter; went outdoors; drove a car; shopped for groceries, clothes, and personal hygiene items; listened to music; watched television; read newspapers, magazines, and the Bible; socialized; and occasionally went to church. T. 172-78; T. 50. She had no problems paying attention, finishing what she started, following written and spoken instructions, getting along with bosses or others in authority, and remembering things. T. 178-79.

Plaintiff testified that she was no longer able to work due to central core myopathy which caused chronic pain throughout her body; as well as diabetes, hypertension, and asthma. T. 42- 43, 51. She acknowledged that she could lift and carry ten pounds, sit for two hours at a time, stand for fifteen minutes at a time,

and walk continuously for two blocks. T. 48-49. Plaintiff stated that she slept about six hours per night. T. 51. Victor Alberigi, an impartial vocational expert ("the VE") reviewed the evidence of record and testified that the U.S. Department of Labor's Dictionary of Occupational Titles (DOT) describes plaintiff's past relevant work as medium work, but as performed by plaintiff it was light work. The ALJ then asked the VE whether a hypothetical individual who:

1) had the same past relevant work experience as plaintiff;

2) was of the same age as plaintiff;

3) had the same educational background as the plaintiff;

4) was able to lift and/or carry ten pounds occasionally;

5) was able to stand for two hours out of an eight-hour workday, but no more than fifteen minutes at a time;

6) was able to sit for six hours out of an eight-hour workday, but no more than two hours at a time;

7) must avoid climbing ladders, ropes, and scaffolds;

8) could occasionally balance;

9) must avoid concentrated exposures to respiratory irritants as well as extreme temperatures and humidity;

10) must avoid workplace hazards such as dangerous machinery and unprotected

heights; and

11)  could frequently, but not continuously, perform fine and gross manipulation

could perform plaintiff's past relevant work. T. 55.  The VE responded that the

individual could not perform plaintiff's past relevant work. The ALJ then asked

the VE whether such an individual could perform sedentary work. Id.  The VE

answered affirmatively and cited the job of document preparer (3,300,000 jobs

nationally, 6,210 jobs regionally), envelope addresser (170,000 jobs nationally,

990 jobs regionally), and charge account clerk (229,000 jobs nationally, 470 jobs

regionally) as examples of such occupations. T. 55-56.[3]  He added that if such

individual was additionally limited to only occasional fine and gross manipulation,

she could not perform any of the occupations previously cited, but could perform

the occupation of surveillance systems monitor (87,000 jobs nationally, 60 jobs

regionally).[4] T. 57.

A sleep study, conducted on December 12, 2008, revealed sleep apnea,

"mild to moderate in nature with impact on oxygenation." T. 249.  Dr. Parker, a

sleep medicine specialist, recommended continuous positive airway

pressure/bilevel positive airway pressure (CPAP/BiPAP). Id.  Dr. Page, plaintiff's

---

[3]      See DOT Job Code Nos. 249.587-018, 209.587-010, and 205.367-014, respectively. (4th ed. rev.1991).

[4]      See DOT Job Code No. 379.367-010. (4th ed. rev.1991).

11

treating physician, followed her from April 2009 through September 2010 for complaints of myopathy, hypertension, diabetes, asthma, and sleep apnea. T. 291-314. Plaintiff stated that her general health was fair. T. 291, 293, 297, 300, 303, 306, 312. Dr. Page observed that plaintiff was healthy and well developed with no signs of acute distress. Id. Plaintiff's lungs were clear with regular respirations and no wheezing. T. 292, 294, 298, 301, 304, 307, 310. Her heart exhibited a regular rate and rhythm with normal sounds and no murmurs. Id. Dr. Page submitted the conflicting opinion that plaintiff "is able to work" and that her disability due to pain was permanent. T. 291, 293, 297, 300, 303, 306, 312. The doctor repeatedly assessed diabetes mellitus without mention of complication, type II or unspecified type, not stated as uncontrolled; myopathy, unspecified; asthma, extrinsic, unspecified; sleep apnea; and hypertension, benign. T. 291, 294, 297, 298, 300, 301, 303, 304-05, 306, 309, 312, 313-14. An x-ray of plaintiff's chest, taken on April 21, 2009, was unremarkable. T. 317. Dr. Sirotenko, a consultative physician, examined plaintiff on October 3, 2009 and assessed that she may benefit from activities of a sedentary nature only. T. 282. Plaintiff should avoid: activities beyond a moderate degree of physical exertion; respiratory triggers which may exacerbate her asthma; operating heavy equipment machinery or driving an automobile; and situations in which sleeping may place her or others in

danger. Id. Plaintiff told Dr. Sirotenko that she had a history of hypertension, sleep apnea, asthma, diabetes, and myopathy. T. 279-80. Upon examination, Dr. Sirotenko observed that plaintiff's blood pressure level was at 142/102 mm Hg. T. 280.[5] Her respiratory rate was 18 respirations per minute.[6] Plaintiff was in no acute distress. Her gait and station were normal. She walked on her heels and toes. Her squat was 50% full. Plaintiff had no difficulty changing for the examination, getting on and off of the examination table, and rising from a seated position. Id. Her lungs were clear to auscultation. T. 281. Plaintiff's heart exhibited a regular rhythm with no murmur, gallop, nor rub. She demonstrated a full range of motion in her cervical and lumbar spine. Plaintiff had no scoliosis, kyphosis, nor abnormality in her thoracic spine. Straight leg raising tests were negative bilaterally. She demonstrated a full range of motion throughout her arms and a limited range of motion in her hips and knees. Plaintiff exhibited muscle strength at grade 4/5 throughout her arms and legs. Her joints were stable and non-tender with no redness, heat, swelling, nor effusion. She complained of myofascial pain in her shoulder girdles, arms, upper and lower hip girdles, and

---

[5]     A hypertensive individual is one whose systolic blood pressure level is at least 140 mm Hg, and/or whose diastolic blood pressure is at least 90 mm Hg. The Merck Manual of Diagnosis and Therapy, §16, Chapter 199 (17 ed. 1999).

[6]     At rest, the normal respiratory rate in adults is 14 to 18 cycles per minute. Degowin's Diagnostic Examination (8th ed. 2004).

legs. Id. She had no cyanosis, clubbing, nor edema in her extremities. T. 282.

Plaintiff's hand and finger dexterity was intact. Her grip strength was at grade 4/5.

Id. As to her activities of daily living, plaintiff told Dr. Sirotenko that she bathed

and groomed herself; cooked light meals; cleaned; did laundry; shopped; and

watched television. T. 280. Dr. Sirotenko diagnosed hypertension, poorly

controlled; history of diabetes with no diabetic retinopathy nor neuropathy; history

of sleep apnea; history of asthma, currently stable; and myopathy. T. 282.

In a letter dated May 29, 2010, Dr. Twydell, plaintiff's treating physician,

stated that he recently examined her for complaints of increased neck, lower back,

and right arm pain as well as weakness in her hands. T. 326. Dr. Twydell assessed

that plaintiff should only occasionally use her hands for fingering and handling.

He opined that plaintiff was unable to perform full-time work due to pain. Id.

## II.    Discussion

Plaintiff submits that the ALJ erred by failing to request a treating source

opinion of plaintiff's limitations from Dr. Twydell; the ALJ's RFC finding is not

supported by substantial evidence and is the product of legal error; the ALJ failed

to apply the appropriate legal standards in assessing plaintiff's credibility; and the

vocational expert's testimony cannot provide substantial evidence to support the

ALJ's decision because it was based upon an incomplete hypothetical question.

The Commissioner argues that the ALJ's decision, finding that plaintiff was not disabled, is supported by substantial evidence and therefore must be affirmed.

### A.    Standard of Review

This court does not review a final decision of the Commissioner <u>de novo</u>, but instead "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." <u>Butts v. Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004) (internal citations omitted). <u>See also</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Halloran</u>, 362 F.3d at 31 (<u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)). "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." <u>Gravel v. Barnhart</u>, 360 F.Supp.2d 442, 444-45 (N.D.N.Y. 2005) (<u>citing</u> <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)). When reviewing a determination by the Commissioner, a district court, in its discretion, "shall have the power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without

remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.  Disability Defined

An individual is considered disabled for purposes of his or her eligibility for

Social Security Disability if he or she is unable to

> engage in any substantial gainful activity by reason of
> any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

The Commissioner may deem an individual applicant for Social Security

Disability to be disabled

> only if his physical or mental impairment or impairments
> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Social Security Administration regulations set forth a five-step sequential

evaluation process, by which the Commissioner is to determine whether an

applicant for Social Security Disability is disabled pursuant to the aforementioned

16

statutory definition.  <u>See</u> 20 C.F.R. § 404.1520.  The Second Circuit Court of

Appeals summarizes this process as follows:

> The first step of this process requires the Secretary to
> determine whether the claimant is presently employed. If
> the claimant is not employed, the Secretary then
> determines whether the claimant has a "severe
> impairment" that limits [his] capacity to work. If the
> claimant has such an impairment, the Secretary next
> considers whether the claimant has an impairment that is
> listed in Appendix 1 of the regulations. When the
> claimant has such an impairment, the Secretary will find
> the claimant disabled. However, if the claimant does not
> have a listed impairment, the Secretary must determine,
> under the fourth step, whether the claimant possesses the
> residual functional capacity to perform [his] past relevant
> work. Finally, if the claimant is unable to perform [his]
> past relevant work, the Secretary determines whether the
> claimant is capable of performing any other work. If the
> claimant satisfies [his] burden of proving the
> requirements in the first four steps, the burden then shifts
> to the Secretary to prove in the fifth step that the
> claimant is capable of working.

<u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (<u>quoting</u> <u>Perez v. Chater</u>, 77 F.3d
41, 46 (2d Cir. 1996)).

The fifth step "requires the [ALJ] to consider the so-called vocational

factors (the claimant's age, education, and past work experience), and to determine

whether the claimant is capable of performing other jobs existing in significant

numbers in the national economy." <u>Quezada v. Barnhart</u>, 2007 WL 1723615

(S.D.N.Y. 2007) (internal quotations omitted).

A person is deemed disabled if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. Substantial work activity is defined as "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is defined as "work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(a-b) (West 2009).

### C.    Credibility Assessment

An ALJ is required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in pertinent part that:

> [i]n determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence ... These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment,

daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

20 C.F.R. § 404.1529 (West 2007).

Social Security Ruling ("SSR") 96–7p governs how ALJs may evaluate the credibility of an individual's statements. Stated here in pertinent part:

The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements

about the symptom(s) and its functional effects.

3. Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96–7 ( See www.ssa.gov/OP Home/rulings/di/01/SSR96–07–di–01 .html) (2012).

**D.     Analysis**

Plaintiff first argues that the ALJ erred by failing to request a treating source opinion of plaintiff's limitations from Dr. Twydell, and that the ALJ's RFC finding is not supported by substantial evidence and is the product of legal error. Specifically, plaintiff states that there is no treating medical source statement regarding plaintiff's remaining ability to lift, carry, stand, walk, push, pull, reach, handle, stoop and crouch, and the ALJ erred in not recontacting Dr. Twydell for a medical source statement. The Commissioner argues that the ALJ was not required to recontact Dr. Twydell because the evidence of record adequately and completely reflected plaintiff's medical history. The court has painstakingly reviewed the entire record, and finds that the record, as well as plaintiff's own testimony, confirms the ALJ's RFC assessment. The court also concurs that Dr. Twydell's assessment that plaintiff was disabled was inconsistent with the evidence in the record, and accordingly, the ALJ did not err in affording it no controlling weight.

Plaintiff next argues that the ALJ failed to apply the appropriate legal standards in assessing plaintiff's credibility, and that the ALJ's credibility determination is unsupported by substantial evidence. In addition, plaintiff argues that it is improper for an ALJ to find a claimant's statements not fully credible

because those statements are inconsistent with the ALJ's own RFC finding.

The Commissioner asserts that since plaintiff's reported symptoms suggested a greater restriction than demonstrated by the objective evidence alone, the ALJ considered plaintiff's activities of daily living. Plaintiff reported that she independently performed fairly normal activities of daily living, and took care of her own personal hygiene and grooming needs, provided care for her daughter and cooked, washed dishes, swept floors, cleaned the bathroom and the house, and did laundry with help from her husband and daughter. Plaintiff went outdoors, drove a car, and shopped for groceries, clothes and personal hygiene items. She listened to music, watched television, read newspapers, magazines and the bible, socialized and occasionally went to church. She reported that she had no problems paying attention, finishing what she started, following written and spoken instructions, getting along with bosses or others in authority, and remembering things. Consequently, the Commissioner argues, the evidence of record did not substantiate plaintiff's allegations that she was disabled to the extent that she alleged. Again, after reading the entire record, the court concurs, and finds that the ALJ applied the proper standards and properly considered the record, as well as plaintiff's own assessment of her ability to perform the normal activities of daily living, in assessing her credibility.

Finally, plaintiff argues that the vocational expert's testimony cannot provide substantial evidence to support the ALJ's decision because it was based upon an incomplete hypothetical question that did not properly incorporate all of the plaintiff's alleged limitations. Specifically, plaintiff argues that the hypothetical question was the product of a failure to request a medical source statement from Dr. Twydell, errors in determining plaintiff's RFC, and errors in assessing credibility, arguments addressed and adjudicated above. The Commissioner argues that an ALJ is not required to submit every limitation alleged by a claimant to the VE. Instead, an ALJ may rely on a VE's testimony concerning the availability of jobs suited to the claimant's vocational factors and credibly established RFC. Here, the ALJ considered the VE's testimony, and relying on plaintiff's age, education, work experience, and RFC, the ALJ found that although plaintiff was unable to perform any past relevant work, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. The court finds plaintiff's argument regarding the hypothetical question unavailing, and finds that substantial evidence supports the ALJ's finding that plaintiff was not disabled pursuant to the Social Security rules and guidelines.

## III. Conclusion

Accordingly, for the reasons set forth above, plaintiff's motion for judgment

on the pleadings (Doc. No. 12) is DENIED, and the Commissioner's motion for

judgment on the pleadings (Doc. No. 13) is hereby GRANTED.  The Clerk is

instructed to close this case.

SO ORDERED.

September 26, 2012

_____

Neal P. McCurn
Senior  U.S. District Judge